UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KARL WINGO,

       Petitioner,

v.

UNITED STATES OF AMERICA,           Case No. 04-71558

       Respondent.           (Criminal Case No. 91-80936-12)

_____/      Honorable Patrick J. Duggan

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on November 27, 2006.

PRESENT: THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

On April 26, 2004, Petitioner filed a motion under 28 U.S.C. Section 2255 to vacate, set aside, or correct sentence by a person in federal custody.  On January 31, 2005, this Court issued an opinion and order, denying relief on all but one ground raised in the motion.  The only ground left unresolved was Petitioner's claim that he was denied the effective assistance of counsel as a result of his counsel's failure to attend his debriefing sessions with government agents in 1992.  The Court concluded that an evidentiary hearing was necessary to address that issue.  In response to a motion for reconsideration filed by Petitioner, the Court subsequently expanded the issues to be addressed at the evidentiary hearing to include Petitioner's allegation, initially set forth in a footnote to his Section 2255 motion, that he was denied the effective assistance of counsel due to his attorney's absence at negotiations between himself and the prosecutor in September 1993.  *See* 8/1/05 Order.  At Petitioner's request, the Court has appointed counsel to represent him.

The Court conducted an evidentiary hearing on November 15, 16, and 18, 2005. Following the hearing, Petitioner and the government filed supplemental briefs.  Joint Exhibits were submitted to the Court on August 10, 2006.

### Standard of Review

A petitioner is entitled to relief under 28 U.S.C. Section 2255 "[i]f the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."  28 U.S.C. § 2255.  In order to prevail as to alleged constitutional errors, a petitioner must establish "an error of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings." *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999)(citation omitted).  Where the petitioner's motion alleges a non-constitutional error, the petitioner must establish a "'fundamental defect which inherently results in a complete miscarriage of justice,' or, an error so egregious that it amounts to a violation of due process."  *Id.* (quoting *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990)).

### Petitioner's Remaining Claims

Petitioner contends that his attorney's failure to attend debriefing sessions between himself and federal agents in February 1992, is a *per se* violation of his Sixth Amendment right to the effective assistance of counsel.  Alternatively, Petitioner argues that his counsel's failure to attend the meetings was deficient and that he suffered prejudice as a result.  As reflected during the evidentiary hearing– and as clearly stated in Petitioner's supplemental brief following the hearing– Petitioner also asserts that his

2

attorney failed to explain the terms of his agreement with the government with respect to his debriefing.

Petitioner further argues that his attorney failed to counsel him regarding the potential sentence he faced if convicted and, as a result, Petitioner rejected the government's plea offer.  As a remedy for this error, Petitioner asks the Court to enforce the plea offer of twenty years which the government offered him in 1992.  Finally, Petitioner claims that he was denied the effective assistance of counsel when he testified before the grand jury after sentencing (presumably sometime in 1993) and therefore missed the opportunity to seek a reduction in his sentence in exchange for his testimony.[1]

### Factual and Procedural Background

On October 9, 1991, Venus Coleman, Petitioner's sister, was called to testify before the grand jury about drug activities that included conduct by Petitioner.  *See* Joint Ex. 4.  On that date, Coleman and Petitioner asked to meet with the Assistant United States Attorney in charge of the prosecution, Ronald Waterstreet.  *See id*.  Drug Enforcement Agency Special Agents Michael Brown and Scott Garland also were present during the meeting.  *See id*. Brown subsequently prepared a report summarizing the conversation which took place on that date between Petitioner, Coleman, and the government agents.  *See id*.  According to the report, Coleman asked Waterstreet what he wanted from her and Petitioner.  *See id*.  Waterstreet told Coleman

---

[1]It appears that Petitioner no longer claims that he is entitled to Section 2255 relief based on his attorney's absence from alleged plea negotiations between himself and the prosecutor in September 1993.  In any event, the Court does not find support for this allegation in the testimony from the evidentiary hearing.

that if Petitioner worked with the government, it could help in the reduction of his charges. *See id.* The report reflects, and Wingo testified at the evidentiary hearing, that Waterstreet told him during this meeting that if he is found guilty of the charges against him, he could be facing twenty-five years incarceration. *See id.*; 11/15/05 Tr. at 98.

On November 12, 1991, the grand jury returned an indictment charging Petitioner and several other individuals, including Coleman, with various drug-related offenses. On February 13, 1992, Petitioner was named in a forty-eight count superseding indictment charging thirteen individuals with a variety of drug-related crimes. The superseding indictment alleged that Petitioner and a co-defendant led a heroin and cocaine distribution ring in the Detroit area from approximately 1989 until 1991, and that they dealt in a total quantity of drugs exceeding the equivalency of 47,000 pounds of marijuana. Petitioner was arraigned on the superseding indictment on February 25, 1992.

At his initial arraignment, Petitioner was represented by attorney Randall Upshaw. Sometime thereafter, but before February 13, 1992, Petitioner retained the services of Stephen A. Glass, a defense attorney previously licensed in the State of Florida.[2] Glass knew Waterstreet, as Waterstreet previously worked as a prosecutor in Florida.

According to Glass, Petitioner decided that he wanted to work out a deal with the government. 11/16/05 Tr. at 7. Glass thereafter telephoned Waterstreet, at which time Waterstreet explained the procedure used in the Eastern District of Michigan for working

_____

[2]The Florida Supreme Court suspended Glass from the practice of law in late 1993, and he was disbarred in 1994. *See* Joint Ex. 3.

out an agreement.  11/15/05 Tr. at 62.  As Waterstreet explained, first the defendant

and the government enter into a "Kastigar agreement" pursuant to which the defendant

agrees to meet with his attorney, the prosecutor, and federal law enforcement agents

"to make a complete and truthful statement of his knowledge of the subject of the

investigation and other targets the DEA may be interested in investigating."  Joint Ex. 1.

Once the government finds out "the value of the cooperation," it decides what, if any,

type of offer it can extend to the defendant.  11/15/05 Tr. at 62.

On February 6, 1992, Waterstreet sent Glass a Kastigar agreement via facsimile.

11/15/05 Tr. at 64-65.  This agreement, which is the agreement Petitioner signed,

provides in relevant part:

> (1)   Your client agrees to make a complete and truthful
>       statement of his knowledge of the subject of the
>       investigation and other targets the DEA may be
>       interested in investigating.
>
> (2)   No statement made or other information provided by
>       you or your client during this proffer discussion will be
>       offered in the government's case-in-chief in any
>       criminal prosecution of your client.
>
> (3)   The government may make derivative use of and may
>       pursue any investigative leads suggested by any
>       information provided by you or your client.

Joint Ex. 1.  According to Waterstreet, after receiving Glass' assurance that Petitioner

was ready to be debriefed, he arranged for Petitioner to be brought to his office from the

county jail, where he was being held pending trial.  *Id.* at 66-67.  The first meeting

between Petitioner and Waterstreet occurred on February 13, 1992.

At the evidentiary hearing, Petitioner testified that before the February 13

meeting, he and Glass never discussed whether Petitioner would agree to meet with the

5

government in order to be debriefed.  11/15/05 Tr. at 99.  Petitioner stated, however,

that approximately one week after he retained Glass and provided Glass with

Waterstreet's name, he called Glass to inquire whether Glass had been able to work out

a deal with Waterstreet.  11/18/05 Tr. at 80-81.  Glass told Petitioner that he'd been

working on it but needed more time.  *Id.* at 81.  A week later, Petitioner called Glass

again, at which time Glass asked Petitioner: "How does ten to fifteen years sound."  *Id.*

Petitioner interpreted this statement to mean that Glass had secured a plea deal of ten

to fifteen years imprisonment from Waterstreet.  *Id.* at 82.

When asked why he went to Waterstreet's office on February 13, Petitioner

replied: "That was a surprise to me as well.  I was pulled out from the county jail and

ended up in Mr. Waterstreet's office with Waterstreet and agents."  11/18/05 Tr. at 76.

Petitioner further testified that Glass never discussed the Kastigar letter with him and

that the first time Petitioner saw the letter was at the initial debriefing meeting in

Waterstreet's office.  *See id.* at 100-01.  At the evidentiary hearing, Glass did not have

any specific recollection of discussing the Kastigar letter with Petitioner; however, Glass

testified that, based on his usual practice of doing so, he believes he explained the

contents of the letter to Petitioner.  11/16/05 Tr. at 11.  Waterstreet testified that he

asked Petitioner whether his attorney went over the Kastigar letter with him and

Petitioner answered yes.  11/15/05 Tr. at 78.

Petitioner testified that after arriving at Waterstreet's office, Waterstreet

presented him with the Kastigar letter and asked him to sign it.  11/18/05 Tr. at 76.

Petitioner stated that he then asked what the letter was.  *Id.*  According to Petitioner,

Waterstreet responded: "Just sign this here.  Nothing you say is going to be used

6

against you." *Id.*  Petitioner testified that he therefore believed that anything he told the government could not be used against him in any way.  11/15/05 Tr. at 102 & 107.

Waterstreet testified at the evidentiary hearing that it is his standard practice to ask defendants whether they have gone over the Kastigar letter with their attorney and, regardless of their answer, to provide them with some explanation of its terms. 11/15/05 Tr. at 74-75.  With regard to the explanation he provides, Waterstreet stated that he typically tells defendants that they must be one hundred percent truthful at all times, that "anything [they] say can not be used directly against [them]", but that the government "can use what is called derivative use of their evidence against [them]." *Id.* at 75.  According to Petitioner, after Waterstreet presented him with the Kastigar letter, he indicated that he needed his lawyer.  11/18/05 Tr. at 101.  Internal Revenue Service Special Agent Martin Sviland, who attended the February 13 debriefing, recalled a telephone call to Glass after Waterstreet presented Petitioner with the Kastigar letter. 11/16/05 Tr. at 31-32.

According to Petitioner, he then spoke with Glass over the telephone, asking where he was.  11/15/05 Tr. at 104.  Petitioner testified that Glass told him to "calm down" or "don't worry" and that he would be there.  *Id.*; 11/18/05 Tr. at 76.  Petitioner further testified that Glass told him to sign the papers, stating: "Waterstreet is my friend. He won't cross me.  Just sign the papers." *Id.*  Petitioner then signed the Kastigar letter and began providing information to the government regarding his involvement, as well as the involvement of other individuals, in the charged activities.  *Id.* & Joint Ex. 8. Petitioner met with Waterstreet and various federal agents at additional debriefing sessions on February 14, 19, 21, and 24, 1992.  Joint Ex. 8, 10, & 11.

7

According to Petitioner, the debriefings ended smoothly. 11/18/05 Tr. at 67. Waterstreet and Sviland, however, had a different recollection. Waterstreet testified that at the last meeting with Petitioner on February 24, it was conveyed to Petitioner that the government was going to offer him 20 years as part of a plea deal. 11/15/05 Tr. at 93. Waterstreet recalls Petitioner responding: "If I can do 20 years, I can do 45 years" and that he thereafter did not want to continue with any further debriefings. *Id*. Sviland testified at the evidentiary hearing that at the last debriefing, Petitioner "was getting anxious to find out where he was really going with all this [i.e. debriefings]" and when Waterstreet conveyed the 20 year offer, Petitioner said, "If I have to do 20, I can just as easily do 45." 11/16/05 Tr. at 37.

The Report of Investigation completed by DEA Special Agent Steven Mitchell regarding the February 19 and 24 debriefings of Petitioner, however, does not reflect Waterstreet mentioning 20 years to Petitioner. *See* Joint Ex. 10. Moreover, the report indicates that Sviland did not attend the final debriefing of Petitioner on February 24. *See id*. Additionally, earlier in his testimony during the evidentiary hearing, Waterstreet indicated that there was no discussion with Petitioner during the debriefing sessions regarding what sentence the government would be offering him as a result of his cooperation. 11/15/05 Tr. at 72. Sviland's Memorandum of Interview, summarizing the February 21 debriefing, also does not contain any reference to discussions between Petitioner and Waterstreet regarding an offer of 20 years. *See* Joint Ex. 11.

Shortly after the final debriefing on February 24, 1992, Petitioner fired Glass and, on February 27, 1992, attorney Arthur Weiss filed his appearance on behalf of Petitioner. Weiss testified at the evidentiary hearing that after he was retained to

8

represent Petitioner, Petitioner advised him that he had been debriefed by government agents but that he had entered into some type of agreement with the government whereby his statements could not be used against him. 11/15/05 Tr. at 6.  Based on what Petitioner conveyed to him, Weiss believed the government had extended derivative use immunity to Petitioner.  *Id.*  Weiss therefore filed a motion on May 5, 1992, requesting a *Kastigar* hearing.  Prior to filing the motion, Weiss had not seen, and actually was unaware of, the *Kastigar* letter signed by Petitioner.  At the motion hearing on May 8, 1992, however, the government gave Weiss a copy of the letter.  *Id.* at 7.  As the letter indicated that the government had not granted Petitioner "derivative" immunity, the Court denied as moot Petitioner's motion for an evidentiary hearing. *Id.* at 32-33. Shortly thereafter, Petitioner's case proceeded to trial.

Following the jury trial, which began on May 11 and concluded on July 2, 1992, Petitioner was found guilty on eighteen different counts: one count of conspiracy to possess with intent to distribute cocaine and heroin; one count of engaging in a continuing criminal enterprise ("CCE"); two counts of aiding and abetting in the distribution of a controlled substance; one count of possession with intent to distribute heroin; two counts of use of a firearm in drug trafficking; one count of possession of a firearm with an obliterated serial number; eight counts of money laundering; and two counts of unlawful use of a telephone.  This Court initially sentenced Petitioner to prison for a total of forty-five years.  As set forth in more detail in the Court's previous opinion and order, after two appeals to the Sixth Circuit and one trip to the Supreme Court, this Court eventually vacated Petitioner's conspiracy conviction and his two convictions for use of a firearm during a drug trafficking offense and sentenced Petitioner to 360

9

months imprisonment.  This sentence was affirmed by the Sixth Circuit.  *See United States v. Wingo*, Case No. 01-1669, 2003 WL 22114017 (6th Cir. Sept. 9, 2003).

## Applicable Law

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the assistance of counsel in order to protect the defendant's fundamental right to a fair trial.  U.S. CONST. amend. VI.  The Sixth Amendment right to counsel "'is to the *effective* assistance of counsel.'"  *Strickland v. Washington*, 466 U.S. 666, 686, 104 S. Ct. 2052, 2063 (1984)(emphasis added).  The Supreme Court has recognized that this right extends beyond the actual trial to events where "the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary, or by both."  *United States v. Ash*, 413 U.S. 300, 310, 93 S. Ct. 2568, 2574 (1973).  As the Sixth Circuit Court of Appeals has summarized the Supreme Court's rulings on this issue:

> . . . an accused has the right to the effective assistance of counsel at the "critical stages" in the criminal justice process. *United States v. Wade*, 388 U.S. 218, 224, 87 S. Ct. 1926, 18 L.Ed.2d 1149 (1967); *see Maine v. Moutton*, 474 U.S. 159, 170, 106 S. Ct. 477, 88 L.Ed.2d 481 (1985). That right has been extended to certain pretrial proceedings that "might appropriately be considered parts of the trial itself," . . . *Ash*, 413 U.S. at 310, 93 S. Ct. 2568.  As the Court recognized in *Wade*, "today's law enforcement machinery involves critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality." 388 U.S. at 224, 87 S. Ct. 1926.

*United States v. Moody*, 206 F.3d 609, 613 (6th Cir. 2000).  This right to counsel, however, only attaches after the initiation of formal judicial proceedings.  *Id.*

Courts apply a two-part test to evaluate ineffective assistance of counsel claims:

10

> First, the defendant must show that counsel's performance
> was deficient.  Second, the defendant must show that the
> deficient performance prejudiced the defense.  This requires
> showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.  In assessing counsel's performance,

courts must consider "whether 'counsel's representation fell below an objective standard

of reasonableness,' as measured by 'prevailing professional norms.'"  *Rickman v. Bell*,

131 F.3d 1150, 1154 (6th Cir. 1997)(quoting *Strickland*, 466 U.S. at 687-88, 104 S. Ct.

at 2064-65).  "To establish prejudice, a defendant must demonstrate a reasonable

probability that 'but for counsel's unprofessional errors, the result of the proceeding

would have been different.'"  *Id.* at 1155 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct.

at 2068).  Prejudice is presumed, however, when counsel is completely denied at a

critical stage of the proceedings, such as when counsel is absent.  *United States v.

Cronic*, 466 U.S. 648, 659, 104 S. Ct. 2039, 2047 (1984).

Criminal defendants can waive their Sixth Amendment right to counsel.  Similarly,

a defendant can waive his or her Fifth Amendment privilege against self-incrimination.

However, "[w]aivers of constitutional rights not only must be voluntary but must be

knowing, intelligent acts done with sufficient awareness of the relevant circumstances

and likely consequences."  *Brady v. United States*, 397 U.S. 742, 748, 90 S. Ct. 1463,

1469 (1970).  Determining whether a defendant effectively waived his or her

constitutional rights requires the following analysis:

> First, the relinquishment of the right must have been
> voluntary in the sense that it was the product of a free and
> deliberate choice rather than intimidation, coercion, or
> deception.  Second, the waiver must have been made with a
> full awareness of both the nature of the right being

11

> abandoned and the consequences of the decision to
> abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141 (1986).  These two

inquiries must be evaluated based on the totality of the circumstances.  *Id.*

### Analysis

In support of his Section 2255 motion, Petitioner primarily focuses on his

counsel's failure to attend the debriefing sessions between himself and government

agents in February 1992.  It appears to this Court, however, that the more obvious and

critical error made by Petitioner's counsel in this case was counsel's failure to

adequately and effectively explain to Petitioner, before the debriefing sessions began,

the terms of the Kastigar letter.  According to Petitioner's testimony at the evidentiary

hearing, which this Court finds credible, as well as the testimony of Arthur Weiss, the

attorney who replaced Glass, Petitioner did not receive sufficient legal advice from his

attorney prior to the debriefing sessions to comprehend the scope of immunity granted

by the government.  Petitioner also mistakenly believed that he had an agreement of ten

to fifteen years from the government in exchange for his statements.  *See* 11/18/05 Tr.

at 82.  As a result, Petitioner waived his Fifth Amendment rights without a full

awareness of the consequences of his decision.  Counsel's failure to subsequently

attend the debriefing sessions between Petitioner and government agents only

exacerbated the prejudice resulting from counsel's other errors.

The attorneys testifying at the evidentiary hearing in this matter regarding the

standard of care in this district unanimously agreed that effective counsel should

discuss the Kastigar letter with their clients and make sure their clients understand the

terms of the letter before signing it and before beginning debriefing sessions with government agents.  11/15/05 Tr. at 13-14; 11/18/05 Tr. at 8-9 & 20-22.  One of the attorneys, Steven Fishman, testified that clients "absolutely" do not understand the terms of the Kastigar letter absent his explanation and that he would not discuss with his clients "anything as complicated as a Kastigar letter on the telephone."  11/18/05 Tr. at 20-22.   Fishman further testified that he would not rely on an AUSA to explain the Kastigar letter to his client.  *Id.* at 23.  In responding to whether it would comport with the standard of care to not explain a Kastigar letter to a client before the client signed it, Weiss testified:

> No, I don't think so.  From my perspective, the last thing a defense attorney wants, especially given this type of case where the defendant was charged with a continuing criminal enterprise and was looking at a significant amount of incarceration time is you want to make sure that all the i's are dotted and the t's are crossed . . . And that everybody goes into it with their eyes open, knowing exactly what's going to transpire.

11/15/05 Tr. at 13-14.  Weiss further testified that he would never leave a meeting with a client where the terms of a Kastigar letter had been discussed without making sure the client understood the type of immunity offered in the letter.  *Id.* at 57.

Although agreeing with the government that Petitioner reads, writes, and understands the English language, Weiss testified that he did not believe Petitioner could understand, absent counsel's assistance, at least the term of immunity set forth in the Kastigar letter:

> . . . even with attorneys, I mean, You can talk about the ability to make derivative use and have the cognitive ability to read the phrase, but in terms of being able to know the actual pragmatics, I think requires a little bit of experience

13

> and insight that my recollection of Mr. Wingo, and again, I
> could be wrong, but I don't think he had a criminal record,
> would be lacking.

11/115/05 Tr. at 41.

Petitioner testified that Glass never discussed the terms of the Kastigar agreement with him and that the first time he was aware of the letter was when Waterstreet placed it in front of him at the initial debriefing session.  11/15/05 Tr. at 100-01; 11/18/05 Tr. at 76.  In fact, Petitioner testified that, before the first debriefing session on February 13, 1992, he and Glass had not even discussed the debriefing process or whether Petitioner would agree to be debriefed.  11/15/05 Tr. at 99; 11/18/05 Tr. at 75. According to Petitioner, the only explanation he received regarding the terms of the Kastigar letter, was Waterstreet's summary at the first meeting.  11/15/05 Tr. at 102-03.

Based on Waterstreet's explanation, Petitioner believed that the information he provided to the government during the debriefing sessions could not be used against him in any way.  For several reasons, the Court finds credible Petitioner's testimony regarding his understanding of the Kastigar letter's terms– or lack thereof– when he signed the letter in 1992.

First, in describing at the evidentiary hearing how he typically summarizes the terms of the Kastigar letter for defendants at the initial debriefing session, Waterstreet specifically used the phrase, "Anything you say can not be used directly against you."[3] 11/15/05 Tr. at 75.  Second, based on what Petitioner told Weiss after Weiss replaced

---

[3]While Waterstreet testified that he also tells defendants that the government can make derivative use of their statements, *see* 11/15/05 Tr. at 75, the Court believes that the explanation would be less than clear to a lay person.  *See, infra.*

14

Glass and shortly after the debriefing sessions concluded, Weiss was under the impression– prior to seeing the actual Kastigar letter– that Petitioner had an agreement with the government which precluded the government from making derivative use of Petitioner's debriefing statements.  11/15/05 Tr. at 35-39.  This suggests to the Court that Petitioner has not contrived his current position regarding what he was told and what he understood back in February 1992, in order to support his Section 2255 motion.  Second, while Glass testified that he explained the terms of the Kastigar agreement to Petitioner, he had no specific recollection of where or when the conversation(s) took place or exactly what he told Petitioner.  11/16/05 Tr. at 11.  In fact, when asked at the evidentiary hearing when or how it was he had a conversation with Petitioner concerning the Kastigar letter, Glass testified that he knew he met Petitioner in person.  *Id.*  But the first time Glass met Petitioner in person was at Petitioner's arraignment on the superseding indictment on February 25, 1992– a day after the debriefing sessions concluded.  11/15/05 Tr. at 97.

Finally, the Court believes that Waterstreet's and Glass' recollection at the evidentiary hearing of what they told Petitioner in February 1992, was based on their standard practices, rather than any specific recollection of what they actually said in Petitioner's case.  Waterstreet acknowledged that he has attended hundreds of debriefing sessions over his sixteen year career as a federal prosecutor.  The Court finds it surprising that Waterstreet or Glass, more than ten years after the fact and without specific notes to refresh their recollections[4], would remember what they told this

---

[4]The Special Agents' notes of the debriefing sessions do not reflect any discussion of the Kastigar letter's terms or the signing of the agreement.  *See* Joint Ex.

15

particular defendant, as opposed to what they may have told other defendants.

Even if Glass did explain the terms of the Kastigar letter to Petitioner, it appears that his explanation was incorrect or at least contradictory. At the evidentiary hearing, although claiming familiarity with the immunity provision set forth in the government's uniform Kastigar letter, Glass inaccurately characterized that provision. 11/16/05 Tr. at 9-10. Explaining what he would have told Petitioner regarding the Kastigar letter, Glass testified: "The term I would have used and what I did use was 'transactional immunity.'" 11/16/05 Tr. at 10. Clearly, however, the Kastigar letter did not provide Petitioner "transactional immunity." As the Supreme Court has explained, "transactional immunity . . . accords full immunity from prosecution for any offense to which the compelled testimony relates." *Kastigar v. United States*, 406 U.S. 441, 453, 92 S. Ct 1653, 1661 (1972). According to Glass, however, he also told Petitioner that he was not getting total immunity from the crime– a statement which conflicts with his first explanation– but that he was "getting immunity from the use of the statement"– a statement not precisely describing the type of immunity set forth in the Kastigar letter. 11/16/05 Tr. at 10.

The Court finds the District Court for the District of Columbia's decision in *United States v. Oruche*, 257 F. Supp. 2d 230 (2003), particularly instructive in the present case in deciding whether the advice Petitioner received, if any, was adequate. In *Oruche*, the lack of clarity in a *Kastigar* letter containing terms almost identical to those in the letter Petitioner signed, coupled with what amounted to ineffective advice by the

---

8 & 10-11. At the evidentiary hearing, Glass testified that he had not been able to locate Petitioner's file or any notes regarding his representation of Petitioner. 11/16/05 Tr. at 3-4.

defendant's counsel in explaining the terms of the letter, led the court to conclude that

the defendant's waiver of his Fifth Amendment privilege against self-incrimination was

not a knowing and intelligent act and that therefore the government should have been

barred from derivatively using at trial any statements the defendant made during

debriefing sessions with government agents.[5]  *Id.* at 243-44.

 The debriefing letter in *Oruche* provided in pertinent part:

> (1) First, *except for paragraphs two and three below*, no
> statements made by or other information provided by your
> client during the "off-the-record" debriefing(s) will be used
> directly against your client in any criminal proceeding.
>
> (2) Second, the government may make derivative use of and
> may pursue any investigative leads suggested by any
> statements made by or other information provided by your
> client.  (This provision is necessary in order to eliminate the
> necessity for a *Kastigar* hearing at which the government
> would have to prove that the evidence it would introduce at
> trial is not tainted by any statements made by or other
> information provided by your client.)

*Id.* at 232 (emphasis added).  The defendant alleged that during the debriefing session

he admitted to participating in illicit activities with an individual previously unknown to

the government and whose testimony subsequently was introduced before the grand

jury to charge the defendant with additional crimes and at trial to secure his conviction.

*Id.*  The defendant claimed that, in explaining the terms of the debriefing letter to him,

his attorney advised that nothing he said during the debriefing could be used against

---

[5]In *Oruche*, the trial court initially denied the defendant's request for a *Kastigar*
hearing.  On a motion to reconsider filed after the defendant was convicted, the trial
court reversed itself and concluded that a *Kastigar* hearing was necessary to determine
whether the government utilized any statements made by the defendant during his
debriefing sessions to acquire evidence that was used against him.  257 F. Supp. 2d at
244.

him.  *Id.* at 234.

At an evidentiary hearing, the defendant's attorney testified that, during a half

hour to one hour meeting and during several additional meetings prior to the debriefing

session, he had explained the contents of the letter to his client, including an

explanation of the second paragraph's provision that the government could derivatively

use his statements against him.  *Id.* at 232-33.  The Court, however, found the accuracy

of the attorney's testimony "highly suspect" because it directly conflicted with the

attorney's argument at an earlier hearing that he and his client assumed that any

information or evidence provided by the defendant during debriefing would not be used

against him "in any shape, form or fashion"– an argument that was consistent with what

the defendant claimed he was told by the attorney.  *Id.* at 233.  The court therefore

credited the defendant's testimony and concluded that he had received inaccurate legal

advice regarding the scope of immunity granted by the debriefing letter.  *Id.* at 240.

The court held that this inaccurate legal advice compounded the following

ambiguity in the language of the debriefing letter:

> The language the government chose to utilize in its
> Debriefing Letter to indicate that the defendant was being
> granted only use immunity, and not also derivative use
> immunity, is ambiguous to the degree that this Court
> concludes that a layperson, faced with the incorrect advice
> given by the defendant's prior attorney, would reasonably
> believe that any statements he made during the debriefing
> session could not be used against him in any fashion. . . .
> [T]he immunity agreement begins by informing the defendant
> that the government will not use any statements made
> during the "off-the-record" debriefing sessions directly
> against him. This expansive grant of immunity is only
> qualified by the subsequent two paragraphs.  The paragraph
> at issue in this case begins by stating that "the government
> may make derivative use of and may pursue any

18

investigative leads suggested by any statements made by or
other information provided by your client." . . . To understand
this sentence, one must understand what derivative use
means.  And while competent counsel would be able to
explain to a client the meaning of derivative use, without
such advice, a layperson cannot be expected to comprehend
the term.  Although the derivative use language is followed
by the statement that the government "may pursue any
investigative leads[,]" this language does not fully convey the
potential consequences a suspect may suffer by
participating in the debriefing session.  In other words, it is
one thing to say that one's statements can be used as the
basis for conducting further investigation, it is quite another
to say that if additional evidence is acquired with the use of
one's statement that the additional evidence can be used as
the basis for charging the person with other crimes and then
using that evidence against the person at trial.

*Id.* at 241 (internal footnote omitted).  While the court in *Oruche* presumed that

competent counsel would ameliorate any potential misconceptions about the scope of

immunity resulting from the agreement's lack of clarity, the court noted that "this was not

the case" in the matter before it.[6]

This was not the case here, as well.  For the reasons discussed previously, the

Court finds that Petitioner was not given accurate legal advice, if he was provided any at

all, concerning the scope of immunity set forth in the government's *Kastigar* letter.  The

Court also believes that counsel provided ineffective assistance in describing the

_____

[6]This Court notes that the debriefing letter Petitioner signed probably is less clear
than that at issue in *Oruche*.  The second paragraph of the letter signed by Petitioner,
like the first paragraph in the *Oruche* letter, provides that "[n]o statement made or other
information provided by you or your client during this proffer discussion will be offered in
the government's case-in-chief in any criminal prosecution of your client."  *See* Joint Ex.
1.  However, unlike the first paragraph in the *Oruche* letter, the second paragraph of the
letter signed by Petitioner does not expressly inform the defendant that the expansive
grant of immunity contained in the paragraph is qualified in subsequent paragraphs.
*Compare* Joint Ex. 1 ¶ 2 *with Oruche*, 257 F. Supp. 2d at 232.

debriefing process to Petitioner and, as a result, Petitioner believed, when he signed the *Kastigar* letter, that if he told the truth during the debriefing sessions, he had a firm plea offer from the government of ten to fifteen years imprisonment. *See* 11/15/05 Tr. at 82-83.

The Court further concludes that Petitioner received ineffective assistance of counsel as a result of his attorney's failure to attend the debriefing sessions. At least two district courts have concluded that a criminal defense attorney provides ineffective assistance of counsel to his or her client when the attorney fails to attend debriefing sessions between the client and the prosecutor. *Tyler v. United States*, 78 F. Supp. 2d 626, 632 (E.D. Mich. 1999)(Gadola, J.); *United States v. Jones*, No. 96-259, 2001 WL 127300, at *10-11 (E.D. La. 2001)(unpublished opinion); *see also United States v. Ming He*, 94 F.3d 782 (2d Cir. 1996)(concluding that "the government's standard practice in this district of conducting debriefing interviews outside the presence of counsel is inconsistent, in our view, with the fair administration of criminal justice"); *United States v. Moody*, 206 F.3d 609, (6th Cir. 2000)(finding ineffective assistance of counsel based on counsel's failure to attend six debriefing sessions between the defendant and government agents but reversing district court's order granting the defendant Section 2255 relief because the sessions occurred pre-indictment, before the defendant's Sixth Amendment right to counsel attached). The attorneys testifying at the evidentiary hearing informed the Court that it is the standard practice of defense attorneys in the Eastern District of Michigan to attend at least the beginning of the first debriefing session between a client and the government. 11/15/05 Tr. at 12-14; 11/18/05 Tr. at 10-11 & 18; *Id.* at 36. Fishman and Weiss expressed that it is "critically important" for

20

2:91-cr-80936-PJD    Doc # 1073    Filed 11/27/06    Pg 21 of 27    Pg ID 917

defense counsel to attend the first debriefing session to make sure that counsel has a decent relationship with the AUSA *and* the agents assigned to the case and that a decent relationship develops between the client, the AUSA, and the agents.  11/18/05 Tr. at 10; 11/15/05 Tr. at 26-27.  Weiss stated that, in his opinion, an attorney would be remiss to not attend the initial Kastigar debriefing and that he could not envision a scenario where he would think it was okay to send a client into an initial meeting with the government and not be present.  11/15/05 Tr. at 13. Thus the Court concludes that Petitioner has satisfied the first prong of *Strickland*'s two-part test.

Petitioner argues that the debriefing sessions were a critical stage of the proceedings and that therefore, pursuant to *Cronic,* it is presumed that the second prong of the *Strickland* test is met– i.e. that counsel's deficient performance prejudiced Petitioner's defense.  The Court does not agree that debriefing is a critical stage of the proceedings under *Cronic*.[7]  Nevertheless, the Court concludes that Petitioner has shown that he suffered prejudice as a result of his counsel's errors.

Due to his attorney's ineffectiveness, Petitioner waived his Fifth Amendment privilege against self-incrimination without a "sufficient awareness of the relevant circumstances and likely consequences" of his decision to abandon his rights.  *Brady*, 397 U.S. at 748, 90 S. Ct. at 1469.  Like the defendant in *Oruche*, Petitioner asserts that he therefore, during the debriefing sessions, admitted to participating in illicit activities

---

[7]Even if counsel's absence at the debriefing sessions established a *per se* violation of Petitioner's Sixth Amendment rights, to prevail on his Section 2255 motion, Petitioner still must show that this constitutional error "had a substantial and injurious effect or influence on the proceedings."  *Watson*, 165 F.3d at 488.

with individuals previously unknown to the government: Michael Zajac, Joann Person, Carnel Perry, and Tirrell ("Terry") Harris.  *See* Pet.'s Supp. Br. at 4; 11/15/05 Tr. at 117-18.  According to Petitioner, these individuals essentially told Petitioner that after they learned that he had "done spilled the beans," they decided that they "might as well get aboard too."  11/15/05 Tr. at 118.  These individuals subsequently provided government agents with statements and testified extensively against Petitioner at his trial.

The government has not asserted that its agents knew about Petitioner's involvement with Zajac, Person, Perry, or Harris from some other source.  However the initial indictment, filed several months before Petitioner's debriefing sessions began, charged Petitioner with offenses involving Harris that occurred on May 3, 1990.  On that date, an undercover officer observed Petitioner, Brett Lang, *and* Harris purchase heroin and Detroit Police Officers then stopped and arrested the three individuals.[8] Government agents also were aware of Zajac's drug activities before Petitioner was debriefed; although Petitioner contended at the evidentiary hearing that the government nevertheless was not aware of *his* involvement with Zajac prior to the debriefing sessions.[9]  In any event, Petitioner's argument to support his claim of prejudice is not based only on his assertion that the government was unaware of these individuals prior

---

[8]This incident was the subject of counts ten and eighteen of the superseding indictment: possession with intent to distribute heroin and use of a firearm during a drug trafficking offense.

[9]Prior to Petitioner's debriefing sessions, the government had obtained, through wiretaps, recorded telephone conversations between Zajac and Petitioner, as well as conversations between Zajac and other defendants.  According to Petitioner, however, it only was through the information Petitioner provided during his debriefing sessions that the government was able to identify Zajac as one of the participants in the calls.

to the debriefing sessions, but also on his assertion that these four individuals only decided to cooperate with the government because they learned that Petitioner already had done so.

Having reviewed the reports from the debriefing sessions and the transcripts from Petitioner's trial, the Court concludes that the constitutional errors identified only entitle Petitioner to habeas relief with respect his CCE conviction.  In this Court's view, there is a reasonable probability that the result of Petitioner's trial would have been different with regard to the CCE charge if Petitioner had not provided certain information to the government during the debriefing sessions. With respect to his remaining convictions, however, the Court finds that the government possessed and introduced at trial substantial independent evidence (i.e. evidence not obtained as a result of the information it learned during Petitioner's debriefings) for the jury to have found Petitioner guilty.

Petitioner was charged with distributing heroin on February 23, and March 21, 1990 (counts three and four of the superseding indictment), based on an undercover agent's purchase of heroin from Petitioner on those dates.  The undercover agent testified at trial concerning those transactions.  The government obtained the evidence to support its conviction on count ten of the superseding indictment– possession with intent to distribute heroin on May 3, 1990– when an undercover officer observed Petitioner, Harris, and Lang purchase heroin and Detroit Police Officers' subsequently stopped and searched their vehicle.  The officers involved in this incident also testified at trial.  The government similarly obtained the evidence to support Petitioner's

conviction for possession of a firearm with an obliterated serial number (count twenty-five of the superseding indictment) well before Petitioner's debriefing sessions. That conviction was based on a gun found when government agents executed a search warrant on November 30, 1990, at an apartment where Petitioner was staying. Petitioner's money laundering convictions (counts twenty-six through thirty-three) were established by evidence independent of the information Petitioner provided during his debriefing sessions.[10]  Finally, Petitioner clearly was convicted of unlawful use of a telephone (counts forty-five and forty-seven) based on the extensive wiretap evidence the government introduced, which also was obtained before Petitioner was debriefed.

In comparison, it is at least reasonably probable that the jury relied on information derived solely from the debriefing sessions to convict Petitioner of the CCE charge. Specifically, the Court finds that Zajac's testimony played a significant role in the prosecution's ability to establish two of the elements of this charge. Without Zajac's testimony, the Court believes that the jury may have reached a different verdict.

First, to show that Petitioner derived a substantial income from his drug trafficking activities, the government relied on Zajac's testimony that he saw Lang with $60,000 to $100,000 in cash and that Lang identified the money as belonging to Petitioner. *See* Trial Tr. XXV at 115.  Second, during his lengthy testimony, Zajac

---

[10]As indicated by the initial indictment, the government was aware of the financial transactions which were the subject of the money laundering counts prior to Petitioner's debriefing. Without the information Petitioner provided during the debriefing sessions, the Court was able to establish that the property really was purchased for Petitioner, that the individuals in whose names the property was purchased lacked the funds to make the purchase, and that the purchase money therefore came from drug proceeds.

provided extensive details of transactions and interactions with Petitioner which reflected Petitioner's leading role in the criminal enterprise. The government offered other evidence suggesting that Petitioner directed, supervised, or organized the other members of the drug conspiracy. Unlike the information Zajac provided during his trial testimony, however, the jury had to interpret much of the government's other evidence to conclude that it established Petitioner's role as a leader. For example, the government pointed to a recorded telephone conversation during which Petitioner is discussing the execution of search warrants on "all my boys," the fact that other individuals went to Petitioner to find out the cost of the drugs, a recorded phone conversation where Petitioner is heard instructing Lang on how to cut drugs, and another conversation where he is providing Lang with the product of five times two hundred. *See* Trial Tr. XXV at 106 & 114 & Trial Tr. XXVII at 97-101. In this Court's view, this evidence could have meant something to the jury other than that Petitioner was the leader of the continuing criminal enterprise.

Petitioner argues that his counsel's absence at the debriefing sessions had a broader impact on the outcome of his case in that it resulted in a breakdown in plea negotiations. The Court rejects Petitioner's argument, as the Court does not believe that the testimony at the evidentiary hearing established that the government extended a plea offer to Petitioner during any of the debriefing sessions. *See, e.g.,* 11/15/05 Tr. at 72. The Court finds no other basis to grant Petitioner's request to enforce the government's plea offer of 20 years.

This is not a case where counsel failed to relate the government's plea offer to

his or her client.  *Cf. Satterlee v. Wolfenbarger*, 453 F.3d 362 (6th Cir. 2006)(ordering state to reinstate its previous plea offer where habeas petitioner's counsel failed to communicate the plea offer to the petitioner).  Petitioner testified at the evidentiary hearing that, sometime after the debriefing sessions concluded but before trial, Weiss informed him of the government's offer.  *See* 11/15/05 Tr. at 105.  Petitioner testified that he rejected the offer because he believed he faced a maximum sentence of 25 years, and there was little difference to him of serving 20 years as opposed to 25 years. *Id.* at 105-06.  Apparently, Petitioner's incorrect understanding regarding the maximum sentence he faced, was based on what Waterstreet told him in October 1991.[11] Petitioner has not claimed, and there was no testimony at the evidentiary hearing suggesting, that any of Petitioner's attorneys incorrectly advised him of his potential maximum sentence.  Thus the Court cannot find that ineffective assistance of counsel caused Petitioner to reject the government's plea offer.  The Court does not believe that Waterstreet's statement demonstrates an error entitling Petitioner to habeas relief in the form of enforcement of the plea offer.

## Conclusion

For the reasons set forth above, the Court concludes that Petitioner was denied effective assistance of counsel with respect to the debriefing process.  As a result of counsel's deficient performance, Petitioner waived his Fifth Amendment privilege against self-incrimination and was debriefed by the government without a sufficient

---

[11]Notably, this conversation between Waterstreet and Petitioner on October 9, 1991, occurred before Petitioner's November 12, 1991 indictment in this case.

26

awareness of the relevant circumstances and likely consequences of his actions.  There

is a reasonable probability that the result of Petitioner's trial with respect to his CCE

conviction would have been different if Petitioner had not provided the government with

the information he did during the debriefing sessions.  The Court therefore holds that

Petitioner is entitled to partial relief pursuant to 28 U.S.C. § 2255.[12]

Accordingly,

**IT IS ORDERED**, that Petitioner's motion pursuant to 28 U.S.C. § 2255 is

**GRANTED** as to his conviction for engaging in a continuing criminal enterprise and that

conviction is hereby **VACATED(Count S2)**;

**IT IS FURTHER ORDERED**, that Petitioner's motion is **DENIED** as to Petitioner's

other convictions;

**IT IS FURTHER ORDERED**, that Petitioner's Motion for Bail Pending Resolution

of Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 is

**DENIED AS MOOT**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Joan Ellerbusch Morgan, Esq.
AUSA Wayne Pratt

---

[12]Also pending before the Court is Petitioner's motion for bail pending resolution
of his Section 2255 motion.  As the Court now has resolved Petitioner's Section 2255
motion, it denies as moot his request for bail.

27